UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA
2009 AUG 17 PM 3: 08
LORETTA G. WHYTE
CLERK

GENE P. BONVILLAIN, in his capacity as
ASSESSOR for the PARISH OF TERREBONNE,
STATE OF LOUISIANA,

      Plaintiff,

v.

BADGER OIL CORP., an entity organized under
the laws of Louisiana, and C. P. HILLIARD,

      Defendants.

09 5791

Civ. No. _____ SECT. C MAG. 2

JURY TRIAL
DEMANDED

---

## COMPLAINT

---

NOW COMES the Plaintiff, GENE P. BONVILLAIN, in his capacity as Assessor

for the Parish of Terrebonne, State of Louisiana, through counsel, and for this, his complaint

for damages and other relief, would state and show as follows:

### PARTIES AND JURISDICTION

1.     Plaintiff Gene B. Bonvillain ("Bonvillain") is the Assessor of the Parish of

Terrebonne, a subordinate local governmental entity of the State of Louisiana.

2.     Defendant Badger Oil Corp. ("Badger") is an entity organized and having its

principal place of business in Louisiana at Suite 400, 3861 Ambassador Caffery, Lafayette,

Louisiana 70503 (Post Office Box 52745, Lafayette, Louisiana 70505).

$250

✓ Fee
__ Process
X Dktd
__ CtRmDep
__ Doc. No. _____

1

3.     Defendant C. P. Hilliard ("Hilliard") is an individual believed to be a resident of Louisiana.  Hilliard is an employee of Badger and  responsible for the preparation and submission of tax documents, as hereinafter alleged.

4.     This is an action for the recovery of delinquent and unpaid taxes and for other relief.

5.     Jurisdiction is conferred on this Court by virtue of 28 U.S.C. § 1331 and 18 U.S.C. § 1964(c).  A substantial part of the events or omissions giving rise to the claim occurred in this district, and a substantial part of property that is the subject of the action is situated in this district.

## GENERAL FACTUAL ALLEGATIONS

6.     Terrebonne Parish is one of the coastal parishes of Louisiana, located on the Gulf of Mexico ("the Gulf").  Below the surface of the Gulf and within the coastal lowlands immediately adjacent to the Gulf are located some of the major producing oil and gas fields in the United States.  These oil and gas fields in some cases extend into the Gulf far from the coastal boundary of the State of Louisiana.  For the purposes hereof, the oil and gas fields to which the allegations of this complaint relate are limited to the fields within the jurisdiction of the State of Louisiana, extending from the Gulf Coast of Louisiana, encompassing the areas immediately adjacent thereto ("the Inshore Fields"), to the limit of its jurisdiction, three miles offshore ("the Offshore Fields").  The Inshore and Offshore

Fields, taken together, are mature fields, meaning that the fields have been extensively developed, and minerals have been extracted from them for many years and even decades.

7.     The minerals and natural gas within the Inshore and Offshore Fields are exploited by a number of oil and gas production, exploration, and drilling companies, one of which is Badger.  Each of the Inshore and Offshore Fields, depending upon its respective location, is within the jurisdiction of one of the several coastal parishes, such as Terrebonne Parish.  There are approximately 1,546 oil and gas wells and other production facilities within, inshore, or offshore from Terrebonne Parish, many of which are within the Inshore or Offshore Fields.  Badger has approximately four wells within Terrebonne Parish, plus others located elsewhere within the jurisdiction of Terrebonne Parish that may, upon further investigation, become the subject of additional lawsuits.

8.     The extraction of minerals and gas from the Inshore and Offshore Fields requires the use of complex and costly equipment.  A well must be drilled to access the minerals below the surface, the minerals (oil and gas) must be brought to the surface (sometimes requiring the application of artificial pressure), and then the minerals must be transported via either pipeline (called a "fee line") or by barge to a production facility, from which the minerals then are transported to onshore refineries or finishing plants.

9.     Badger and the other oil and gas production companies, having installed the necessary equipment, must continuously monitor and do monitor the flow of minerals through the system hereinbefore described.

10.    The oil and gas production companies, including Badger, are required by law to pay to the State of Louisiana severance taxes on all minerals and gas extracted and removed from Louisiana, including from the Inshore and Offshore Fields. The Louisiana severance taxes are paid based on the volume of minerals and gas that pass through the valves which measure, meter, and control the flow of minerals. The oil and gas production companies periodically and regularly report the volume of minerals and gas that flow through the metering devices to the Louisiana Department of Natural Resources for purposes of assessing the amount of severance tax due and owing by each taxpayer to the State of Louisiana for a particular time period.

11.    Until approximately 1998, the regulatory policy of the Louisiana Tax Commission required that the oil and gas companies report the production of the wells in the Inshore and Offshore Fields on a well-by-well basis. That is to say, the output for each well for each reporting period was measured and reported by the operator of that particular well to the Louisiana Department of Natural Resources.

12.    At the urging and insistence of the oil and gas production companies and the trade association representing the independent production companies, the Louisiana Independent Oil & Gas Association ("LIOGA"), the Louisiana Tax Commission was persuaded in 1998 or thereabouts to change its policy regarding the measurement and reporting of oil and gas production from the Inshore and Offshore Fields for purposes of determining the amount of severance tax due on the production for each period. Instead of reporting production well by well, individually, as they had done previously, each operator

4

of the wells in a particular field (which may and typically do contain many wells) instead filed a "unitary report," which consolidated the reporting of the production of all wells within that field.

13. Under this form of unitary reporting, there was no way to determine whether the reported production from a particular field was comprised of the production from all, some, or only one well within that field. Instead, the operator of the wells in a particular field reported only the gross production from all wells which were producing in that field. Those wells that have current production are termed "producing wells." Those wells that have no current production are said to be "shut in." Wells that have a low output of less than 10 barrels of oil or 100 Mcf (100,000,000 cubic feet) of natural gas per day are termed "stripper wells."

14. By statute, all nonexempt movable and immovable property in Louisiana is subject to the payment of ad valorem taxes to the parish in which the property is located by the owners of that property. These taxes are collected by the several parishes in Louisiana as general revenue for application to those public purposes determined by the governing authorities of the parishes. These taxes represent a substantial source of revenue for the parishes.

15. The constitutional authority and responsibility for the assessment and collection of ad valorem taxes is vested in the office of the parish assessor. That officer for the Parish of Terrebonne is Plaintiff Bonvillain. The collection of taxes is vested in the office of the Sheriff of the Parish of Terrebonne.

16.    The assessment of ad valorem taxes is premised in the first instance on the fair market value of the property being assessed.  The fair market value of property being assessed for tax purposes is reduced by a ratable amount or percentage of the fair market value, the result of which then becomes the assessed value of the property in question.  The rate or percentage applied and used to determine the assessed value of property is established by an equalized schedule approved by the Louisiana Tax Commission.  These various percentages are applied ratably, depending on the type of property and its location.

17.    In general, the valuation of property, hence the basis for the assessed tax owed on property located on dry land, can be and often is determined upon visual inspection by officers designated for the purpose by the assessor.

18.    Visual inspection by the assessors of movable property located inshore or offshore is generally not feasible, since the assessors have neither the manpower nor the resources to conduct visual inspections of the thousands of wells and other facilities located in the Inshore and Offshore Fields.  Accordingly, the Louisiana Tax Commission has adopted a system of self-reporting.  The assessed value of oil and gas property, including that property used to produce oil and gas from the Inshore and Offshore Fields, is determined solely on the basis of reports filed under oath by the affected oil and gas producing companies that own and operate that equipment.  The taxpayers report the value of their equipment and other movable property, hence their exposure to liability for payment of ad valorem tax, on a form designated by the Tax Commission as a "LAT12 form." (See Exhibit A attached).

19.     Various categories of equipment are reported on particular kinds of LAT12 forms. For example, certain meters are to be reported on Form LAT12-2, whereas a lease line is to be reported on Form LAT12-4. It is the duty and obligation of the taxpayer to report the quantities and types of machinery and equipment used in the production and transmission of oil and gas on the appropriate and correct LAT12 form, since it is on the basis of the reporting that the percentage rate of taxation or "millage" is calculated. In addition to all of the other false and materially misleading reporting of property subject to taxation hereinafter alleged to have been committed by and on behalf of Badger, Badger and those acting on its behalf misleadingly and confusingly failed to report or incorrectly reported property subject to taxation on incorrect LAT12 forms.

20.     The LAT12 forms are filed under oath by the affected taxpayers annually with the Office of the Assessor for the parish in which the taxable property is located. One LAT12 form, or a group of related LAT12 forms, is filed for each oil and gas field that the taxpayer operates within the Inshore and Offshore Fields.

21.     The LAT12 form provides detail whereby the equipment used on each well or production facility, or to connect each well to a production facility, within a given field is identified and reported. Each well within that field is (or should be) characterized as "producing," "shut in," or "stripper," as hereinbefore described.

22.     The ad valorem tax owed on equipment used to produce and distribute oil and gas from the Inshore and Offshore Fields is determined as follows. Each item of property is valued at its fair market value when acquired new at the time that particular item was

placed in service.  The fair market value of all oil and gas producing facilities in Louisiana is reduced by a uniform percentage of 40%, then reduced by a further 15%, to determine the assessed value of the property.  The assessed value of the property is multiplied by a millage rate to determine the amount of the tax owed for that item of property.  Furthermore, for each year that the item of movable property remains in service, its assessed value is reduced by a uniform percentage amount to account for depreciation.

23.     Equipment and machinery used to produce oil and gas in the Inshore and Offshore Fields typically have a useful life of many years.  The acquisition and installation costs of that equipment are very high, providing an incentive for the operator to maintain and repair it, rather than to replace it.  Unless a floor were established for the assessed value of the depreciated property for the years it remains in service, eventually the fully depreciated value of the taxable property would be zero, hence, its assessed value would be zero, and no tax would be assessed and paid for that particular item for that tax year and for all succeeding tax years, even though the item remains in service contributing to the production of the well or production facility with which it is associated.

24.     Until 2005, as hereinafter alleged, the floor below which the value of the property in question could not be depreciated was 30% of its original assessed value.  In other words, when a particular item of property was depreciated fully to 30% of its assessed value, the value of that item could not be depreciated further.

25.     The foregoing scheme for determining the assessed value of property used in the Inshore and Offshore Fields applies only to wells that are characterized as "producing."

If a well is characterized as a "stripper" well, then the property associated with that well is taxed based on a uniform rate of 60% of its assessed value. If the well is characterized as "shut in," then the property associated with that well is taxed based on a uniform rate of 10% of its assessed value. Some wells that have been shut in for a lengthy period of time are characterized as having "no further utility" ("NFU"), and those wells are not taxed at all.

26.     During late 2004 and early 2005, the oil and gas production companies in Louisiana, through or in concert with LIOGA, urged the Louisiana Tax Commission to reduce the floor for depreciation from 30% to 20%. This proposal was vigorously opposed by Plaintiff Bonvillain, since the self-evident result of reducing the depreciation floor would be to lower the assessed value of a substantial percentage of the oilfield equipment (in many cases now fully depreciated) that otherwise would have been taxed based on the higher depreciation floor of 30%.

27.     In an effort to persuade the Tax Commission of the merits of its position, LIOGA commissioned a report by Affiliated Tax Consultants ("the ATC Report"). One of the authors of the ATC Report, in a cover letter transmitting a copy of the report to Plaintiff Bonvillain, stated that "[t]here was no information provided directly by any operator. The data was taken from one source, the [Louisiana] Department of Natural Resources web site."

28.     In reliance on the results of the ATC Report, which was filed with and accepted by the Tax Commission, the Tax Commission by regulation reduced the depreciation floor from 30% to 20%, as urged by LIOGA and the oil production companies, despite the opposition of Plaintiff Bonvillain and the other assessors in the affected parishes. As

hereinafter alleged, the ATC Report was false and fraudulent in a number of material respects.

29.     It eventually became apparent to Bonvillain that Badger and certain of the other oil production companies operating inshore and offshore in Terrebonne Parish were fraudulently and falsely underreporting their ad valorem tax liability. Badger and certain other of the operators in the parish did so in three material ways, each of which will be described hereinafter.

30.     In an effort to determine the true and accurate ad valorem tax liability owed by Badger and the other oil production companies operating in Terrebonne Parish, Bonvillain commissioned a comprehensive study of the operations of those companies from Visual Lease Services, Inc., of Holdenville, Oklahoma (the "VLS Study"). The VLS Study involves physical inspection of all 1,546 wells and all production facilities located within Terrebonne Parish during 2008 and 2009. The VLS Study has thus far uncovered vast and pervasive underreporting and false reporting of tax liability by Badger and certain of the other oil production companies in the following respects.

31.     The fair market value on a replacement-cost-new-less-depreciation basis (as determined by the valuation established by the Louisiana Rules and Regulations, Less Depreciation ("LaRRLD") method, which will be used hereinafter) of much of the property that was reported by Badger as being in service in the Inshore and Offshore Fields in 2008 was underreported by a substantial amount. For example, the operator reported nonexempt

property having a depreciated value of $5,026,886 when in fact that same property at that location had an actual depreciated value of $8,428,167.28.

32.    Some property owned by Badger and that was in service at the Inshore and Offshore Fields in the tax year 2008 was not reported at all.  The VLS Study identified property having a fully depreciated value of $515,777.48 that had not been reported by the operator at all for the tax year 2008.

33.    Plaintiff is reliably informed and on the basis of that information alleges that Badger had other and additional property in service at other fields during the tax years 1998-2008 that was also not reported.  When and as investigation develops the nature, amount, and assessed value of that other property not reported, this complaint will be amended to allege those amounts.

34.    By way of illustration of the nature of property that was not reported by Badger are photographic images taken in 2008-2009 of property omitted from reporting by Badger, which images are attached hereto and marked Collective Exhibit B, and by this reference made a part hereof.

35.    In addition, Badger reported wells as being "shut in," when in fact those wells were producing.  For example, certain of the wells operated by Badger were reported to the Assessor of Terrebonne Parish as being "shut in" at various times, while for the same periods those selfsame wells were reported elsewhere and for other purposes as being "producing," thus reducing materially the amount of ad valorem tax that should have been paid with

respect to the equipment used for that well. Many, if not all, of those wells continue to be producing.

36.     The cumulative effect of the false, fraudulent, and materially misleading underreporting, nonreporting, and misreporting of taxable property by Badger to the Assessor of Terrebonne Parish is for Badger and certain other of the other oil and gas production companies operating in Terrebonne Parish to have underpaid the ad valorem tax due by many millions of dollars. Plaintiff is reliably informed, and on the basis of that information alleges, that the foregoing false, fraudulent, and materially misleading practice of self-reporting the value of property for purposes of assessing ad valorem tax liability by Badger has been ongoing and continuous for at least the ten years next preceding the date hereof and in many instances for much longer.

37.     At no time prior to the date hereof has Defendant filed a revised, amended, or corrected LAT12 for any of the tax years material hereto.


## COUNT I:  RECOVERY OF DELINQUENT TAXES
### (Versus Badger)

38.     The allegations of ¶¶ 1-37 are realleged as if repeated verbatim.

39.     At all times material to the allegations of this complaint Plaintiff Bonvillain was, and still is, the duly qualified, elected, and acting Assessor of Terrebonne Parish, Louisiana, having the authority under LSA-R.S. §§ 47:5 and 47:1903 to assess for collection lawful taxes for Terrebonne Parish, Louisiana.

40.    At all times material to the allegations of this complaint Badger owned movable property for the production of oil and gas located within the taxing jurisdiction of Terrebonne Parish.

41.    Plaintiff Bonvillain or his predecessor in office caused to be placed on the assessment rolls of Terrebonne Parish movable property and assessed the property for purposes of taxation pursuant to the LAT12 self-reporting forms submitted under oath by Badger for the tax years 1998 through 2008, inclusive.  Attached hereto, marked Collective Exhibit A, and by this reference made a part hereof, is a LAT12 Form or Forms for the year 2008, which are illustrative of each and all other LAT12 Forms submitted by or on behalf of Badger for the years at issue.

42.    The LAT12 self-reporting tax forms, as hereinbefore alleged, require the taxpayer to report under oath fully, completely, and accurately all movable oil and gas production property that is subject to tax and that is owned by the taxpayer and the true and accurate assessed value thereof.

43.    Subsequently, and based on the foregoing self-reporting assessments by Badger, Plaintiff Bonvillain levied taxes against Defendant's property for the years 1998 through 2008, inclusive.   In accordance with his customary practice, from and after about March 1 of each succeeding year, the Sheriff of Terrebonne Parish sent a written tax bill for the taxes to Badger.  Each bill included a demand that Badger pay the taxes specified therein on or before a stipulated date of the current tax year and of each succeeding year through 2008 inclusive.

44.     Not until after an investigation was recently initiated was it determined by Plaintiff that Badger has been falsely and fraudulently underreporting, misreporting, or failing to report the ownership of movable property and/or the assessed value of property within Terrebonne Parish subject to the assessment and payment of ad valorem taxes having a value far in excess of the assessed value reported to Terrebonne Parish for at least the years 1998 through 2008, inclusive, and beginning perhaps earlier.   While investigation to determine the amount of tax owed by Defendant Badger remains ongoing, Plaintiff has thus far determined that Defendant Badger has evaded payment of ad valorem taxes in an amount of not less than $637,582, exclusive of interest, penalties, and costs of collection.

45.     Badger operates in several fields within Terrebonne Parish. Plaintiff is reliably informed, and on the basis of that information alleges, that the foregoing pattern and practice of fraudulent underreporting, nonreporting, and misreporting the nature and extent of its property subject to ad valorem taxation by Badger is systematic within all fields in Terrebonne Parish in which Badger operates.   When and as further investigation develops with respect to other fields, this complaint will be amended to allege the further and additional liability to which Badger is exposed for ad valorem taxation of movable property within those fields.

46.     In addition to any and all other remedies available to Plaintiff, Defendant shall be liable for payment of penalties as provided for in LSA-R.S. § 47:2330 for having willfully underreported its tax liability as hereinbefore alleged.

47.    Badger's failure to pay the taxes of at least $637,582, or such other amount as may be determined upon further investigation, caused Defendant to become indebted to Terrebonne Parish for a penalty fee, plus interest until the tax is paid.

WHEREFORE, Plaintiff demands that judgment be entered in his favor and against Badger on Count I and that Plaintiff be awarded the following:

a.    The amount of tax due in the amount of not less than $637,582, or such other amount as investigation may determine, with interest on that amount as allowed by LSA-C.C.P. art. 1921, from and after 1998 to the date of judgment in this action;

b.    A penalty fee in an amount to be determined upon a trial of this cause;

c.    Costs of this action; and

d.    Such other and further relief as the Court deems just and proper.

## COUNT II:  CIVIL RICO
### (Versus Hilliard)

48.    The allegations of ¶¶ 1-47 are realleged as if repeated verbatim.

49.    Badger is an "enterprise" within the meaning of § 1961(4) of the Racketeering Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1961-1968.  Badger is a corporate entity that at all relevant times possessed and continues to possess an ongoing organizational structure.  Badger functioned continuously as an oil and gas company during the relevant time period, and continues to so function.

50.     At all relevant times and currently, Badger was and is engaged in, and its activities have affected and continue to affect, interstate and foreign commerce. For example, Badger produces oil and gas from fields in Louisiana that is thereafter transmitted and sold as refined products, such as gasoline and diesel fuel, throughout the United States.

51.     Hilliard is at all times relevant to this action and still is a RICO "person" within the meaning of 18 U.S.C. § 1961(3).

52.     Hilliard was and is employed by Badger as the person responsible for the preparation and submission of tax documents on behalf of Badger; he conducted and participated in, and continues to conduct and participate in, the conduct of Badger's affairs through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

53.     In particular, Hilliard engaged in the above-described scheme to defraud the Parish of Terrebonne of tax revenues that it was lawfully entitled to collect.

54.     Hilliard engaged in conduct in violation of 18 U.S.C. § 1341 by causing to be mailed various documents for the purpose of carrying out this scheme to defraud. Relevant acts of mail fraud include the mailing during 2008 to the Plaintiff, in his capacity as Assessor for the Parish of Terrebonne, of false and fraudulent LAT12 forms, copies of which have been attached hereto as Collective Exhibit A.

55.     The acts of mail fraud perpetrated by Hilliard constitute a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5) in that there were two or more acts of racketeering activity, all of which occurred after the effective date of RICO, and

the last of which occurred within ten years after the commission of a prior act of racketeering activity.

56.     The acts of racketeering activity alleged above have sufficient continuity to constitute a pattern of racketeering activity in that they have been practiced by Hilliard over a period of at least ten years as part of the scheme to defraud Terrebonne Parish of tax revenues.  Moreover, Hilliard, directly or through the instrumentality of Badger, continues to engage in acts of racketeering activity as part of his ongoing scheme to perpetuate a fraud on Terrebonne Parish.  Indeed, but for the recent VLS Study and the commencement of this action, there is no reason to believe that the scheme would not have continued indefinitely.  As such, Hilliard's conduct projects into the future with a threat of repetition.

57.     The acts of racketeering activity alleged above are also related in that they have the same purpose, results, participants, victim, and methods of commission, and are not isolated events.  The wrongful acts are all part of a series of connected criminal racketeering activities perpetrated by Hilliard as part of his ongoing scheme to defraud Terrebonne Parish.

58.     The acts of racketeering activity have occurred in the Eastern District of Louisiana and elsewhere.

59.     Hilliard's violations of 18 U.S.C. § 1962(c) have proximately caused Terrebonne Parish great injury and harm in that it has been defrauded of not less than $637,582 in tax revenues as a result of the pattern of racketeering activity.

60.     As such, Terrebonne Parish was and is being injured in its business and property by reason of Hilliard's violations of 18 U.S.C. § 1962(c) and is entitled to recover

threefold the damages it has sustained and the cost of this suit, including a reasonable attorney's fee.

61.     As part of his scheme to avoid the payment of taxes to Terrebonne Parish, Hilliard concealed his activities from the Plaintiff.  In light of the adoption of the self-reporting system based on the difficulty of visually inspecting the offshore and inshore property that is the subject of the taxpayer's self-reporting, Plaintiff did not know of, and had no way of knowing of, the injury suffered by Terrebonne Parish as a result of Hilliard's fraudulent conduct until the recent conclusion of the VLS Study.

WHEREFORE, Plaintiff demands that judgment be entered in his favor and against Hilliard on Count II and that Plaintiff be awarded the following:

a.     Threefold the amount of damages suffered as a result of Hilliard's RICO violations, the specific amount of such damages to be proven at trial;

b.     Costs of this action, including a reasonable attorney's fee; and

c.     Such other and further relief as the Court deems just and proper.


## COUNT III:  FRAUD
### (Versus Badger and Hilliard)

62.     The allegations of ¶¶ 1-61 are realleged as if repeated verbatim.

63.     From and after about 1998 and continuing until the present, Badger was doing business and owned taxable property in Terrebonne Parish, rendering it liable for the payment of ad valorem taxes to Terrebonne Parish, as alleged hereinbefore, pursuant to Subtitle III of Title 47 of the Revised Statutes of Louisiana.

64.    Badger is required by law to file or cause to be filed under oath with Plaintiff true, complete, accurate, and correct tax reporting information pursuant to the LA12 forms, as hereinbefore alleged.

65.    Hilliard, and those acting in concert with him, caused Badger to submit under oath LAT12 forms for each of the relevant reporting periods from and after 1998 until 2008, inclusive.

66.    Plaintiff reasonably relied upon the information submitted under oath by Badger pursuant to each and every one of the LAT12 forms filed for the relevant reporting periods from and after 1998 until 2008, inclusive, to assess the tax owed by Badger for the tax reporting periods 1998 through 2008.

67.    Instead of Badger's reporting the foregoing tax information truthfully and accurately, as it is required by law to do, Hilliard, and those acting in concert with him, caused Badger instead to file LAT12 forms for the reporting periods from and after 1998 until 2008 that were false and materially misleading in the following respects:

a.    The fair market value on a replacement-cost-new-less-depreciation basis of much of the property that was reported by Badger as being in service was underreported by a substantial amount;

b.    Substantial amounts, by number and value, of movable property that was eligible for calculation and payment of ad valorem taxes was not reported at all;

c.      Some wells reported as being shut in were in fact producing minerals, thus

underreporting with respect to those wells the amount and value of movable

property that was eligible for calculation and payment of ad valorem taxes.

The precise items and amounts, and the value thereof, of unreported, underreported, and

falsely reported property and the particular LAT12 forms on which that information was

falsely and fraudulently reported are the subjects of further investigation by Plaintiff, the

results of which will be supplied to Defendants during discovery.

68.     The foregoing underreporting of the value of movable property to Terrebonne

Parish by Badger was done with the intent to deceive the Plaintiff and thus reduce the

exposure of Badger to liability for the lawful payment of ad valorem taxes.

69.     As a direct and proximate result of the foregoing false and materially

misleading reporting of its property that was eligible for calculating its liability for the

payment of ad valorem taxes to Terrebonne Parish, Badger underreported its tax liability in

an amount to be determined upon a trial of this cause, but it is believed by Plaintiff at the

present time, and subject to further investigation, that the amount is in excess of $637,582.

70.     As part of the scheme to avoid the payment of taxes to Terrebonne Parish,

Badger and Hilliard concealed their activities from the Plaintiff.  In light of the adoption of

the self-reporting system based on the difficulty of visually inspecting the inshore and

offshore property that is the subject of the taxpayer's self-reporting, Plaintiff did not know

and had no way of knowing of the injury suffered by Terrebonne Parish as a result of

Defendants' fraudulent conduct until the recent initiation of the VLS Study.

WHEREFORE, Plaintiff demands that judgment be entered in his favor and against Badger and Hilliard, jointly and severally, on Count III and that Plaintiff be awarded the following:

a.   Compensatory damages in the nature of unpaid taxes that should have been assessed and paid absent Defendants' fraudulent and false underreporting, nonreporting, and false reporting of Badger's tax liability owed to Plaintiff, the specific amount of such damages to be proven at trial;

b.   Costs of this action, including a reasonable attorney's fee; and

c.   Such other and further relief as the Court deems just and proper.

Plaintiff demands that all issues so triable be tried to a jury.

Respectfully submitted,

*Don M. Richard*

Don M. Richard, Esquire
Bar Roll No. 11226
Michael H. Ellis, Esquire
Bar Roll No. 5334
Julian R. Murray Jr., Esquire
Bar Roll No. 7526
Chehardy, Sherman, Ellis, Murray et al.
Suite 1100
One Galleria Boulevard
Metairie, LA  70001
Telephone:  (504) 830-4130
E-Mail:  dmr@chehardy.com

Kenneth T. Watkins, Esquire
WATKINS, WALKER & EROCHE
501 Roussell Street
P.O. Box 5095
Houma, LA 70361-5095

Counsel for Plaintiff

Ron Kurzman
Of Counsel
305 Broadway, 7th Floor
New York, NY 10007

Service is being made pursuant to Rule 4(d) (Federal Rules of Civil Procedure):

"Waive service of a summons".